

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHERYL W. HERNANDEZ | * | CIVIL ACTION |
| VERSUS | * | NUMBER 00-0260 |
| WAL-MART STORES, INC. | * | JUDGE MARTIN L.C. FELDMAN |
| * * * * * * * * * * * * * * * * * * * * * * * | | MAGISTRATE JOSEPH C. WILKINSON |

<u>MOTION FOR SUMMARY JUDGMENT</u>

NOW INTO COURT, through undersigned counsel, comes defendant herein, Wal-Mart Stores, Inc. ("Wal-Mart"), and on suggesting to the Court that there are no genuine issues of material fact and that mover is entitled to judgment, as a matter of law, moves this Court to enter summary judgment in favor of Wal-Mart, dismissing plaintiff's lawsuit alleging reverse race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and dismissing plaintiff's lawsuit, all at plaintiff's costs, in accordance with the provisions of Federal Rule of Civil Procedure 56.

Respectfully submitted,

Stephen P. Beiser, T.A. (#14074)
Kevin L. O'Dea (#01514)
McGLINCHEY STAFFORD
A Professional Limited Liability Company
643 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 586-1200
Attorneys for Defendant,
Wal-Mart Stores, Inc.

255054.1

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this ___19th___ day of __March__, 20 01, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by mailing the same by United States mail, Hand Delivery properly addressed, and first class postage prepaid.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHERYL W. HERNANDEZ | * | CIVIL ACTION |
| VERSUS | * | NUMBER 00-0260 |
| WAL-MART STORES, INC. | * | JUDGE MARTIN L.C. FELDMAN |
| * * * * * * * * * * * * * * * * * * * * * ** | | MAGISTRATE JOSEPH C. WILKINSON |

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

May It Please The Court:

This Memorandum is submitted on behalf of defendant, Wal-Mart Stores, Inc. ("Wal-Mart"), in support of its Motion for Summary Judgment. For the following reasons, and based upon the undisputed facts in this matter, plaintiff cannot state a cause of action against Wal-Mart for reverse race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Therefore, plaintiff's lawsuit against Wal-Mart should be dismissed.

I.    FACTS

Plaintiff, Cheryl Hernandez, a white female, was employed at Wal-Mart's Chalmette store from July 31, 1989, until February 26, 1999. *See* Complaint, ¶¶ IV, VII, and

VIII.   Plaintiff worked primarily as a cashier and sales clerk, and for the last 3-4 years of her employment, was assigned to the Garden Center.  *See* Exhibit "A," Hernandez Dep., Vol. I, pp. 14-16.  During the last approximately two years of her employment, the Store Manager was Rodney Brown and plaintiff's direct supervisor was Trymel Jones, both black males.  *Id.* at 17-18.  Plaintiff did not have any problems working with either Mr. Jones or Mr. Brown prior to the time that she was terminated.  *Id.* at 26-27.  In fact, plaintiff acknowledged that Mr. Brown was both approachable and "very fair."  *Id.*  Plaintiff received standard evaluations and two merit increases during the course of her employment, and claimed that she did not receive any significant coachings or counselings for performance issues.  *Id.* at 17.

In February 1999, plaintiff, who was working at night, was called to the back office of the store by an Assistant Manager, Suzanne Hemelt, a white female.  *Id.* at 29-30.  Ms. Hemelt advised plaintiff that a black customer had complained about a comment that she made to him that evening, that a cooking pot plaintiff was showing him was so big that:  "You could take this pot to Africa and boil animals in it."  *Id.* at 29-34.  The customer also indicated that he intended to complain to "higher-ups" at the Company, as well as to the news media.  *Id.*  After plaintiff admitted making the comment to the customer, Ms. Hemelt advised plaintiff that, because of the seriousness of the customer's complaint, she was compelled to call the Store Manager, Rodney Brown, at home.  *Id.* at 30-32.  Ms. Hemelt and plaintiff then spoke to Mr. Brown, and plaintiff again confirmed that she made the comment.  *Id.* at 33-34.  Mr. Brown advised plaintiff that he would have to suspend her pending discussion of the matter with his District Manager.  *Id.* at 34.

Mr. Brown subsequently informed plaintiff that the District Manager, Pat Meadowcroft, a white female, had made the decision to terminate plaintiff because of her comment. *Id.* at 34-35. Mr. Brown also advised plaintiff that he realized that she did not intend for the comment to be taken as it was, and that he did not believe that she was a racist. *Id.* Mr. Brown explained to plaintiff that he had convinced Ms. Meadowcroft to make plaintiff eligible for rehire and that Ms. Meadowcroft, after initially instructing that plaintiff not be eligible for rehire, had finally agreed to Mr. Brown's request. *Id.* at 34-38. Plaintiff acknowledged that Mr. Brown "fought" for her to get a rehire. *Id.* at 35.

When completing her termination paperwork, plaintiff complained to Mr. Brown that she was upset that people would think that she was a racist. To assuage plaintiff's concerns, Mr. Brown responded: "No . . . I'm not going to put that down on there [plaintiff's Exit Interview Form] of anything of what really happened. I'm just going to list it as poor customer service." *Id.* at 37. Mr. Brown also advised plaintiff that she was eligible for rehire in 90 days without loss of seniority or benefits. *Id.* at 34-35, 37-38, 53, 156-57. Plaintiff, however, simply chose not to reapply because she believed that new co-workers, who did not know her well (as opposed to all of the other associates in the store who supported her), might not look at her the same way and because she felt that she could be terminated again if another customer ever complained about her. *Id.* at 53-56, 64, 66-67. Similarly, plaintiff did not make any effort to appeal the termination decision because she purportedly heard rumors that such decisions could not be overturned. *Id.* at 43-45.

Plaintiff understood Wal-Mart's anti-discrimination policy and acknowledged that making a racial comment at Wal-Mart was an immediately terminable offense. *Id.* at 56. Plaintiff

-3-

believed that if Mr. Brown had not had to contact his District Manager because of the customer's statement that he would go to "higher ups" and the media, she would not have been terminated. *Id.* at Vol. II, pp. 25-27. Plaintiff felt that the decision-maker, Ms. Meadowcroft, should not have fired her because she did not know plaintiff and should have spoken to her first. *Id.* at Vol. I, pp. 43-44. Tellingly, however, plaintiff testified that she did not try to contact Ms. Meadowcroft or "anybody higher up" after her termination because: "They don't know who you are personally. *If you heard the statement that I made and you didn't know me personally, you would not want to hire me back either.* You have to know me." *Id.* (Emphasis added.)

While plaintiff did not believe that she should have been terminated because she did not intend for her comment to be racially derogatory or offensive to the customer, she admitted as follows:

> I guess when I said the statement, I didn't mean anything by it, but then after you say it, and then so many people say you said it wrong, you shouldn't have did it like that, or, you know, you start doubting yourself, so now I'm doubting myself. At the time I said it, I meant nothing by it, so, but when you hear somebody else say, "Well, you know, maybe that didn't sound too good." Oh yeah, maybe you're right, but at the time I didn't think it was bad.

*Id.* at Vol. II, p. 88.

Following her termination, plaintiff learned, through former co-workers and customers, that black associates, purportedly guilty of a wide range of acts constituting the broad category of "poor customer service," had allegedly received more favorable treatment because they had not been terminated, while several white associates were terminated. *Id.* at Vol. I, pp. 56-59. Accordingly, plaintiff concluded that if she had been black she would not have been terminated. *Id.* at 57.

-4-

Approximately one month after her termination, plaintiff injured her back while exiting an automobile. *Id.* at 120-122. Plaintiff eventually had surgery in September 1999, and has been disabled from working since that time. *Id.* at 125-129. Plaintiff's Social Security Disability application and approval indicate that plaintiff has been totally disabled since February 19, 1999, the date of her termination. *Id.* at Vol. II, pp. 90-93.

In June 1999, plaintiff filed a Charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Exhibit "B," EEOC Charge; *see also* Hernandez Dep., Vol. I, pp. 61-62. The EEOC subsequently dismissed the Charge, finding that there was no evidence of discrimination. *Id.* at 62-63; *see also* Exhibit "C," Dismissal & Notice of Rights. Plaintiff filed this Title VII lawsuit in January 2000.

II.     LAW AND ARGUMENT

    A.     Standard of Review.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In an employment discrimination case, the court focuses on whether a genuine issue exists as to whether the defendant intentionally discriminated against the plaintiff. *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 447 (5th Cir. 1996); *Armstrong v. City of Dallas*, 997 F.2d 62, 65-66 (5th Cir. 1993) (unsubstantiated assertions are not competent summary judgment evidence); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden." *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996) (*en banc*); *Grizzle v. Travelers Health Network, Inc.*, 14 F.3d 261,

268 (5th Cir. 1994) (an employee's self-serving, generalized testimony stating her subjective belief

that discrimination occurred "is simply insufficient to support a jury verdict in plaintiff's favor.").

As the court explained in *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449

(5th Cir. 1993): "Summary judgment, to be sure, may be appropriate, even in cases where elusive

concepts such as motive or intent are at issue, . . . if the nonmoving party rests merely upon

conclusory allegations, improbable inferences, and unsupported speculation." In response to a

motion for summary judgment, the non-moving party is required to present evidence -- not just

conjecture and speculation -- that the defendant discriminated against plaintiff. *See Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1079 (5th Cir. 1994) (*en banc*). Summary judgment is also proper if

the party opposing the Motion fails to establish an essential element of his case. *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98

L.Ed.2d 992 (1988).

      B.     Plaintiff Cannot State a Cause of Action Against Wal-Mart for Reverse
             Race Discrimination.

          1.     Plaintiff Cannot Establish a *Prima Facie* Case of Race
                  Discrimination.

Plaintiff's reverse race discrimination lawsuit is brought pursuant to Title VII of

the Civil Rights Act of 1964, which, *inter alia*, prohibits discrimination on the basis of race. The

allocation and order of proof in a Title VII case follows the burden-shifting scheme that the

Supreme Court first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct.

1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248,

101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444,

448 (5th Cir. 1996).

Under this burden-shifting scheme, plaintiff bears the burden of proof in first establishing, by a preponderance of the evidence, a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 256; *McDonnell Douglas Corp.*, 411 U.S. 792, 802. If plaintiff establishes a *prima facie* case of discrimination, the burden of production, but not the burden of persuasion, shifts to defendant to articulate a reason which, if taken as true, provides a legitimate, non-discriminatory basis for its actions. *Burdine*, 450 U.S. at 256-57; *McDonnell Douglas*, 411 U.S. at 802; *LaPierre*, 86 F.3d at 449. The burden of proof, that is, the burden of persuasion, remains at all times on plaintiff to establish that she was the victim of unlawful discrimination. *St. Mary's Honor Centre v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once defendant comes forward with a non-discriminatory reason for its actions, plaintiff must produce sufficient evidence from which the fact-finder may reasonably reject the employer's explanation, and from which the fact-finder may find that the employer's reason was a mere pretext for discrimination. *Burdine*, 450 U.S. at 252-58, 101 S.Ct. 1089.

Plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination. The requirements are that: (1) plaintiff is a member of a protected class; (2) she was qualified for the position she held; (3) she was discharged or subject to an adverse employment action; and, (4) a person or persons outside the protected class received more favorable treatment. *See St. Mary's Honor Centre v. Hicks*, 559 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), *aff'd*, 90 F.3d 285 (1996); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995), *citing Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

In work rule violation cases such as this, the plaintiff can establish a *prima facie* case by showing "either that he did not violate the rule or, that if he did," employees outside the protected group were not punished similarly. *See Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir.), *cert. denied*, 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980); *see also Mayberry v. Vought Aircraft Company*, 55 F.3d 1086, 1090 (5th Cir. 1995). The burden is on plaintiff to show a similarity between her conduct and that of non-white employees who were treated differently, and not on Wal-Mart to disprove their similarity. "[W]hen relying on comparisons to prove discrimination, the plaintiff has the burden to establish that he was discharged for misconduct that was "nearly identical" to that engaged in by a non-minority who was retained." *Parikh v. United Artists Theaters Circuit, Inc.*, 934 F.Supp. 760, 765 (S.D. Miss. 1996); *see also Williams v. Trader Publishing Co.*, 218 F.3d 481, 484 (5th Cir. 2000); *Little v. Republic Refining* Co., 924 F.2d 93, 97 (5th Cir. 1991); *Malveaux v. Condea Vista Co.*, 85 F.Supp. 655, 657 (W.D. La. 1999). Plaintiff must also establish that the decision-makers were aware of, and overlooked, the very same policy violations by co-workers outside the protected group. *See Jones v. Gerwens*, 874 F.2d 1534, 1541-42 (11th Cir. 1989); *Ellis v. Wal-Mart Stores, Inc.*, 952 F.Supp. 1522, 1529 (M.D. Ala. 1996).

In this case, plaintiff admits that she committed a terminable offense. However, the basis of plaintiff's discrimination claim is that allegedly similarly-situated black employees were not terminated for committing different policy violations that plaintiff believed were also terminable offenses. Plaintiff, however, cannot establish a *prima facie* case of reverse race discrimination because the undisputed facts, based primarily upon plaintiff's own testimony, establish that no similarly-situated non-white employee was treated differently than plaintiff under

circumstances similar, much less "nearly identical," to hers. In addition, plaintiff can offer no evidence whatsoever that the management personnel involved in her termination decision were aware that any other employee, including any non-white employee, had made a racially-offensive comment to a customer, resulting in an extremely irate and justified customer complaint to upper management, regarding an issue as sensitive as *race*, without being subject to the same disciplinary action as plaintiff.

At the time plaintiff was initially deposed in November 2000, she provided admittedly scant information about allegedly similarly-situated non-white employees who were treated more favorably or white employees who received the same allegedly discriminatory treatment. Plaintiff testified that, while she could not remember specific facts that were related to her by others, she maintained notes, written at some undetermined time, that would "probably be much more with the correct answers." *See* Hernandez Dep., Vol. I, p. 102. Plaintiff's notes were produced on February 5, 2001, and plaintiff's deposition relating to the notes was concluded on February 14, 2001. Plaintiff's testimony at that time confirmed that her notes, which simply record hearsay comments made to her by others, provide little, if any, additional information. Furthermore, the alleged instances of disparate treatment identified in the notes are either not similar to plaintiff's situation, did not involve the same decision-maker, or did not involve management's knowledge of a similar, much less "nearly identical," offense being committed. *See* Exhibit "D," Plaintiff's August 12, 1999 Notes.

Critically, plaintiff specifically admitted that the other individuals' situations were not similar to hers because she was not aware of anyone else who made a racial comment to a customer. *See* Hernandez Dep., Vol. II, pp. 94-95. Equally fatal to plaintiff's claim is her

-9-

testimony that she has little to no knowledge of the details of any of those alleged incidents, and what little information she possesses is admittedly composed primarily of speculation and hearsay. *Id.* at 38-57. Such purported evidence is legally inadequate for purposes of opposing summary judgment. *See Garcia v. Reeves County*, 32 F.3d 200, 204 (5th Cir. 1994). Moreover, that speculative and unsupported testimony is directly negated by the sworn Affidavits of Mr. Brown and Assistant Manager Loni Banks, as well as the termination paperwork of the allegedly similarly-situated individuals. *See* Exhibits "E 1-6" and "F," Affidavits of Rodney Brown and Loni Banks, respectively.

A.    Allegedly Similarly-Situated White Employees.

According to plaintiff, two white employees were terminated for making racial remarks.[1]  Plaintiff learned from store rumors that the first employee, Lucille Dragon, was purportedly terminated for advising a white co-worker that another white associate was always "hanging on the black managers." *See* Hernandez Dep., Vol. I, pp. 72-74. Plaintiff, who had no personal knowledge about the incident, later discussed the incident with Ms. Dragon, but could not recall what she said. *Id.* at 75.

In fact, Ms. Dragon was terminated by Rodney Brown for making racial slurs to a white associate who was married to a black man and referring to the managers as "F_ing niggers." *See* Exhibit "F." While Ms. Dragon did not make a racial comment to a customer, her

_____

[1]    Plaintiff testified that two other white associates, Glenn Bourgeois and Brenda Schiro, were also terminated, but those terminations did not involve racial remarks or were not similar to her situation. *See* Hernandez Dep., Vol. I, pp. 78-83, 86; Vol. II, p. 70. Those associates, like plaintiff, were eligible for rehire. *See* Exhibits "E-1" and "E-2," Bourgeois' and Schiro's Exit Interview Forms.

-10-

infraction was certainly a terminable offense.  Nevertheless, Ms. Dragon, like plaintiff, was also designated as being eligible for rehire.  *See* Exhibit "E-3," Dragon's Exit Interview form.

The second white employee purportedly terminated for racial comments was Jan Roth, a Customer Service Manager ("CSM") in a different department, who was allegedly engaged in an altercation with a black co-worker, in which she called the co-worker a "black bitch" and the co-worker called her a "white bitch."  *See* Hernandez Dep., Vol. I, pp. 75-76. Plaintiff was advised by Roth that only Roth was terminated, but admittedly did not know any particulars, including the identity of the black associate, the nature of the dispute, or what information was related to management.  *Id.*  Plaintiff acknowledged that the incident occurred long before plaintiff was terminated and she did not know who was involved in the incident or the termination decision.  *Id.* at 77; Vol. II, pp. 73-74.

In fact, Roth was terminated by Mr. Brown in October 1997 for using vulgar and racially offensive language in an argument with a black co-worker.  *See* Exhibit "E."  Mr. Brown made the decision to terminate Roth because only Roth's violation of Company policy could be confirmed by a witness.  *Id.*  Like plaintiff and Dragon, Roth was deemed to be eligible for rehire.  *See* Exhibit "E-4," Roth Exit Interview Form.

While Roth and Dragon made racial comments to and about co-workers, plaintiff committed the more serious, and different, offense of making a racial comment to a customer, who lodged a vociferous complaint.  Moreover, the decision-maker in the Dragon and Roth cases was Mr. Brown, whom plaintiff acknowledges did not make the termination decision in her case, and who did not discriminate against her.   The decision-maker in plaintiff's case, Ms. Meadowcroft, was not involved in the Dragon or Roth terminations.  *See* Exhibit "E."  In

-11-

any event, without evidence that similarly-situated black associates received more favorable treatment, the terminations of Dragon and Roth establish nothing more than that Wal-Mart enforced its policies uniformly and refused to tolerate racially-offensive comments.

   B.    Allegedly Similarly-Situated Black Employees.

      Plaintiff's allegations of alleged disparate treatment are based entirely on secondhand hearsay, rumor, and speculation. Even assuming, however, that plaintiff could submit admissible evidence supporting those allegations, the following "evidence" of allegedly more favorable treatment of black associates is woefully insufficient to establish that those associates were either similarly-situated to plaintiff, that they engaged in conduct that was "nearly identical" to plaintiff's, or that management was aware of the alleged policy violations.

      1.    According to plaintiff, a black co-worker, Keisha Johnson, was not friendly to either co-workers or customers. *See* Hernandez Dep., Vol. I, pp. 68-71. Plaintiff was advised by others that customers had complained about Johnson's rudeness, but plaintiff did not know the nature of any of the complaints or who may have received them. *Id.* at 90. Plaintiff also believed that a customer that she knows complained that Johnson did not help him find something, but had no information about what he complained about, when, or to whom, or whether management was ever advised. *Id.* at 67-69. Plaintiff was not aware of any racial comments that Keisha Johnson purportedly made to customers or co-workers. *Id.* at 88-90, 100. Similarly, neither Mr. Brown nor Ms. Banks was aware of any customer complaints regarding racial statements or any other terminable offense relating to Ms. Johnson. *See* Exhibits "E" and "F."

      2.    Plaintiff also heard, from undetermined sources, that a black cashier, Charlene "Biemeng," presumably Charlene Bienemy, made a white female customer cry. *See*

-12-

Hernandez Dep., Vol. I, pp. 93-94; Vol. II, pp. 54-57. Plaintiff's notes indicate that, after meeting with the hourly supervisor, Trymel Jones, no action was taken against "Biemeng." *See* Exhibit "D." Plaintiff did not know whether "Biemeng" made any type of racial comment to the customer, nor did she have any information relating to what was said, why the customer purportedly cried, what happened to "Biemeng," when the alleged incident occurred, whether a complaint was made to management, or what upper management knew about it. *See* Hernandez Dep., Vol. I, p. 93-94; Vol. II, pp. 54-57. In short, plaintiff provided no details about the alleged incident, which amounted to nothing more than an unsubstantiated rumor. Contrary to what plaintiff had "heard," Mr. Brown was not aware of any customer complaints relating to any alleged terminable offense committed by "Biemeng." *See* Exhibit "E."

       3.    Plaintiff claims that another black associate, Halema Metoyer, was more favorably treated because she "cursed-out a customer" and was only suspended. *See* Hernandez Dep., Vol. I, pp. 90-91; *see also* Exhibit "D." Plaintiff also learned about this incident from people whose identities she could not even recall. *See* Hernandez Dep., Vol. I, pp. 90-91. While Metoyer used profanity with the customer in July 1998, she, like plaintiff, was also placed on suspension by the Assistant Manager, Ms. Banks, so that she could inform the Store Manager, Mr. Brown, who was not present at the time. *See* Exhibit "F." Metoyer would have been terminated by Mr. Brown after he confirmed that she used profanity with the customer, but she never returned from her suspension and was, therefore, simply terminated several days later for failing to return. *See* Exhibits "E" and "F"; *see also* Exhibit "E-5," Metoyer Exit Interview Form.

4.    The only other black associate arguably similarly-situated to plaintiff was Barbara Flowers, a CSM who purportedly made a racial comment to a customer. *See* Hernandez Dep., Vol. I, p. 92; Vol. II, pp. 49-52. Plaintiff, however, did not recall any facts relating to the alleged incident, and her notes are similarly devoid of any significant information. *Id.; see also* Exhibit "D." Contrary to plaintiff's speculation regarding Ms. Flowers, Ms. Flowers' Exit Interview form confirms that she was an Assistant Manager who voluntarily retired in 1995. *See* Exhibit "E-6," Flowers' Exit Interview Form. There is no record in Ms. Flowers' file of any reported terminable acts relating to customers or of any racial comments made to anyone. *See* Exhibit "E."

5.    Plaintiff referred to other black associates who were also allegedly guilty of "poor customer service," such as Sylvia Lewis, Tamara Johnson, Patricia McLinn, "Cassandra" (presumably Campbell), and other unnamed or unidentified co-workers, but had no firsthand knowledge or other information regarding what had allegedly occurred with those individuals that would remotely suggest that they were similarly-situated to her in any way or had engaged in nearly identical misconduct. *See* Hernandez Dep., Vol. I, pp. 57, 95-96; Vol. II, pp. 38-49; *see also* Exhibit "D."

Even accepting plaintiff's vague assertions and speculation relating to allegedly similarly-situated minority co-workers as true, such bald assertions are legally insufficient to establish disparate treatment, as plaintiff acknowledged that she was not terminated for "poor customer service," but for making an offensive racial comment to a customer. *See* Hernandez Dep., Vol. II, pp. 64-66. While "poor customer service" covers a wide range of varying Company policy violations, some of which (like racial comments) might be terminable while

-14-

others (like rudeness) are not, plaintiff acknowledged that, of the acts that could fall under that wide range, making a racial comment to a customer would be at the top, "maybe number one or two under the list" of terminable offenses. *Id.* at 94-95. Accordingly, plaintiff again implicitly admitted that the other individuals' misconduct was not "nearly identical" to hers because she was not aware of anyone else who allegedly committed an offense as serious as hers.[2] The only other similarly-situated black individual who arguably engaged in nearly identical misconduct, Ms. Metoyer, who "cursed-out" the customer, was, like plaintiff, suspended and then terminated. As plaintiff cannot identify a more favorably treated similarly-situated black associate guilty of "nearly identical" misconduct, she cannot establish disparate treatment. *See Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990) (violations of different Wal-Mart policies insufficient to establish disparate treatment).

> 2.    Plaintiff Cannot Produce any Evidence that Race was a Factor in Her Termination.

In addition to plaintiff's lack of evidence of either disparate treatment or knowledge by management of the same violation of Company policy by others, plaintiff can submit absolutely no evidence, other than her own subjective belief, that race was even a factor in her termination. To the contrary, the undisputed evidence suggests that plaintiff's race was clearly not a factor in the decision to terminate her. In that regard, the following facts are undisputed: (1) plaintiff admitted that she committed the terminable offense of making a racially offensive statement to a customer, confirming that Wal-Mart's reason for terminating her was not pretextual; (2) no other

---

[2]    Wal-Mart's policies specifically identify and highlight the very same inappropriate conduct engaged in by plaintiff, "whether sexual, ethnic, or racial," as behavior that will not be tolerated at Wal-Mart. *See* Exhibit "G," Wal-Mart Associate Handbook, Policies & Procedures, p. 24-25.

-15-

Wal-Mart associates made racial comments to customers and were not terminated; (3) plaintiff does not believe that her black supervisors, Mr. Jones or Mr. Brown, discriminated against her based on her race (*See* Hernandez Dep., Vol. II, p. 79); (4) Mr. Brown attempted to help plaintiff maintain her employment and intervened with his supervisor to ensure that she was eligible for rehire in 90 days; and, finally, (5) the sole decision-maker regarding plaintiff's termination, Ms. Meadowcroft, was, like plaintiff, a white female.

The fact that the individual who made the termination decision was of the same race as the plaintiff is persuasive evidence of the absence of discrimination or discriminatory animus. *See Simien v. Chemical Waste Management, Inc.*, 30 F.Supp.2d 939, 944 (W.D. La. 1998), *aff'd* 174 F.3d 199 (5th Cir. 1999). In *Simien*, the court noted that the supervisor who first reported the unsatisfactory work performance of the plaintiff was of the same race, and concluded that "[i]f an inference of race discrimination had been drawn by [plaintiff's] submitted summary judgment evidence, that inference would be dispelled by this knowledge." *Id.* The same reasoning applies in this case.

There is not a single fact in the record to suggest that plaintiff's termination had anything to do with her race. Similarly, there is no evidence to suggest that the reason for plaintiff's termination was pretextual or that plaintiff was subject to disparate treatment. Accordingly, there is no factual or legal basis for plaintiff's reverse discrimination claim.

-16-

III.    <u>CONCLUSION</u>

        The relevant facts in this matter are straightforward and undisputed.  Plaintiff admittedly committed a terminable offense by making a comment to a customer that the customer felt was racially demeaning and offensive.  As a result of the customer's complaint, Rodney Brown suspended plaintiff so that he could discuss appropriate disciplinary action with Pat Meadowcroft, who instructed Mr. Brown to terminate plaintiff for making the offensive remark.  Mr. Brown prevailed upon Ms. Meadowcroft to make plaintiff eligible for rehire in 90 days.  Plaintiff, although encouraged by Mr. Brown to return to work, refused to do so, believing that she might lose her job again if another customer complained, or that some new employees that she did not know might not look at her the same way.

        Following her termination, plaintiff "heard about" other associates who had committed arguably terminable, but different and admittedly less severe, offenses who allegedly were not terminated.  However, even assuming that plaintiff could submit admissible evidence about other alleged offenses, none of those situations were similar to plaintiff's, much less "nearly identical," nor do they establish that anyone received more favorable treatment than plaintiff, particularly from the same decision-maker, who was the same race as plaintiff.  In sum, there is absolutely no evidence from which it could even remotely be inferred that plaintiff's race had anything to do with her termination.  To the contrary, the undisputed facts suggest that plaintiff's race was clearly *not* a factor in her termination.

        In view of the foregoing, as there are no material facts in dispute and plaintiff cannot establish a *prima facie* case of reverse race discrimination, as a matter of law, Wal-Mart is entitled to summary judgment, dismissing plaintiff's lawsuit, with prejudice.

Respectfully submitted,

STEPHEN P. BEISER, T.A. (#14074)
KEVIN L. O'DEA (#01514)
McGlinchey Stafford
A Professional Limited Liability Company
643 Magazine Street
New Orleans, LA 70130
Telephone: (504) 586-1200
Attorneys for Defendant,
Wal-Mart Stores, Inc.

CERTIFICATE OF SERVICE

I do hereby certify that I have on this _____ 19th _____ day
of _____ March _____, 20 01, served a copy of
the foregoing pleading on counsel for all parties to this
proceeding, by mailing the same by United States mail, Hand Delivery
properly addressed, and first class postage prepaid.

-18-

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHERYL W. HERNANDEZ | * | CIVIL ACTION |
| VERSUS | * | NUMBER 00-0260 |
| WAL-MART STORES, INC. | * | JUDGE MARTIN L.C. FELDMAN |
| * * * * * * * * * * * * * * * * * * * * * ** | | MAGISTRATE JOSEPH C. WILKINSON |

<u>DEFENDANT'S STATEMENT OF UNCONTESTED MATERIAL FACTS</u>

NOW INTO COURT, through undersigned counsel, comes co-defendant herein, Wal-Mart Stores, Inc. ("Wal-Mart), who submits the following Statement of Uncontested Material Facts in support of defendant's Motion for Summary Judgment:

1.

Plaintiff, Cheryl Hernandez, a white female, was employed at Wal-Mart's Chalmette store from July 31, 1989, until February 26, 1999.

2.

Plaintiff worked primarily as a cashier and sales clerk, and for the last 3-4 years of her employment, was assigned to the Garden Center.

3.

During the last approximately two years of her employment, the Store Manager was Rodney Brown and plaintiff's direct supervisor was Trymel Jones, both black males.

4.

Plaintiff did not have any problems working with either Mr. Jones or Mr. Brown prior to the time that she was terminated, and plaintiff described Mr. Brown as both approachable and "very fair."

5.

Plaintiff received standard evaluations and two merit increases during the course of her employment, and claimed that she did not receive any significant coachings or counselings for performance issues.

6.

In February 1999, plaintiff, who was working at night, was called to the back office of the store by an Assistant Manager, Suzanne Hemelt, a white female.

7.

Ms. Hemelt advised plaintiff that a black customer had complained about a comment that she made to him that evening, that a cooking pot plaintiff was showing him was so big that: "You could take this pot to Africa and boil animals in it."

8.

The customer indicated that he intended to complain to "higher-ups" at the Company, as well as to the news media.

-2-

9.

After plaintiff admitted making the comment to the customer, Ms. Hemelt advised plaintiff that, because of the nature of the customer's complaint, she was compelled to call the Store Manager, Rodney Brown, at home.

10.

Ms. Hemelt and plaintiff then spoke to Mr. Brown, and plaintiff again confirmed that she made the comment. Mr. Brown advised plaintiff that he would have to suspend her pending discussion of the matter with his District Manager.

11.

Mr. Brown subsequently informed plaintiff that the District Manager, Pat Meadowcroft, a white female, had made the decision to terminate plaintiff because of her comment.

12.

Mr. Brown explained to plaintiff that he had convinced Ms. Meadowcroft to make plaintiff eligible for rehire and that Ms. Meadowcroft, after initially instructing that plaintiff not be eligible for rehire, had finally agreed to Mr. Brown's request.

13.

When completing her termination paperwork, plaintiff complained to Mr. Brown that she was upset that people would think that she was a racist. To assuage plaintiff's concerns, Mr. Brown responded: "No . . . I'm not going to put that down on there [plaintiff's Exit Interview Form] of anything of what really happened. I'm just going to list it as poor customer service."

-3-

14.

Mr. Brown advised plaintiff that she was eligible for rehire in 90 days without loss of seniority or benefits.

15.

Plaintiff chose not to reapply at Wal-Mart because she believed that new co-workers, who did not know her well (as opposed to the other associates in the store who supported her), might not look at her the same way and because she felt that she could be terminated again if another customer ever complained about her

16.

Plaintiff did not make any effort to appeal the termination decision because she purportedly heard rumors that such decisions could not be overturned.

17.

Plaintiff understood Wal-Mart's anti-discrimination policy and acknowledged that making a racial comment at Wal-Mart that a customer deemed offensive was an immediately terminable offense.

18.

Wal-Mart's policies specifically identify and highlight inappropriate conduct "whether sexual, ethnic or racial" as behavior that will not be tolerated at Wal-Mart.

19.

Approximately one month after her termination, plaintiff injured her back while exiting an automobile and eventually had surgery in September 1999. Plaintiff's Social Security

-4-

Disability application and approval indicate that plaintiff has been totally disabled since February 19, 1999.

20.

In June 1999, plaintiff filed a Charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC").

21.

The EEOC subsequently dismissed the Charge, finding that there was no evidence of discrimination.

22.

Plaintiff has no personal knowledge relating to the circumstances surrounding the termination of Lucille Dragon, a white associate.

23.

Ms. Dragon was terminated in April 1998 by Rodney Brown for using racial slurs to describe managers in the store. Her Exit Interview form indicates that she is eligible for rehire.

24.

Plaintiff has no personal knowledge relating to the circumstances surrounding the termination of Janice Roth, a white associate.

25.

Janice Roth was terminated in October 1997 by Rodney Brown for using vulgar and racially offensive language. Her Exit Interview Form indicates that she is eligible for rehire.

26.

Plaintiff was advised by co-workers and customers that customers had complained about a black associate, Keisha Johnson, being rude or unfriendly, but had no further information about any complaints made against Ms. Johnson.

27.

Plaintiff was advised by undetermined individuals that a black cashier, Charlene "Biemeng," made a white female customer cry, but plaintiff did not know whether Biemeng made any type of racial comment to the customer, nor did she have any information relating to what was said, why the customer purportedly cried, what happened to Biemeng, whether a complaint was made to management, or what upper management knew about it.

28.

Plaintiff has no personal knowledge relating to the circumstances surrounding the termination of Halema Metoyer, a black associate.

29.

In July 1998, Halema Metoyer used profanity with a customer in response to his abusive behavior and was placed on suspension by Assistant Manager Loni Banks, so that she could inform the Store Manager, Mr. Brown, who was not present at the time, about the infraction.

30.

Metoyer never returned from her suspension and was terminated several days later by Ms. Banks for failing to return to the store.

31.

Plaintiff has no personal knowledge relating to the circumstances surrounding the termination of Barbara Flowers, a black associate.

32.

Barbara Flowers was an Assistant Manager who voluntarily retired from Wal-Mart in 1995.

33.

Plaintiff has no personal knowledge regarding instances of possible "poor customer service" by Wal-Mart associates, including Sylvia Lewis, Tamara Johnson, Patricia McLinn, or "Cassandra."

34.

Plaintiff is not aware of any other Wal-Mart associate who made a racial comment to a customer, resulting in a customer complaint to management.

35.

Plaintiff does not believe that either Mr. Jones or Mr. Brown discriminated against her based on her race.

36.

Mr. Brown was always friendly to plaintiff before and after her termination and encouraged her to reapply at the store after she was terminated.

37.

The sole decision-maker regarding plaintiff's termination, Ms. Meadowcroft, was, like plaintiff, a white female.

-7-

Respectfully submitted,

Stephen P. Beiser (T.A.) (#14074)
Kevin L. O'Dea (#01514)
McGLINCHEY STAFFORD LANG
A Professional Limited Liability Company
643 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 586-1200
Attorneys for Defendant,
Wal-Mart Stores, Inc.

254936.1

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this ___19th___ day of ___March___, 20__01__, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by mailing the same by United States mail, Hand Delivery properly addressed, and first class postage prepaid.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHERYL W. HERNANDEZ | * | CIVIL ACTION |
| VERSUS | * | NUMBER 00-0260 |
| WAL-MART STORES, INC. | * | JUDGE MARTIN L.C. FELDMAN |
| * * * * * * * * * * * * * * * * * * * * | | MAGISTRATE JOSEPH C. WILKINSON |

NOTICE OF HEARING

TO:    Cheryl Hernandez
       Mary E. Schillesci, Esq.
       McPherson & Schillesci
       9128 Quince Street
       New Orleans, LA 70118

        PLEASE TAKE NOTICE that defendant herein, Wal-Mart Stores, Inc. ("Wal-Mart"), will bring for hearing its Motion for Summary Judgment on the 4th day of April, 2001, at 10:00 a.m., before the Honorable Magistrate Martin L. C. Feldman, United States District Judge, United States District Court for the Eastern District of Louisiana, 500 Camp Street, New Orleans, Louisiana 70130.

Respectfully submitted,

_____

Stephen P. Beiser, T.A. (#14074)
Kevin L. O'Dea (#01514)
McGLINCHEY STAFFORD
A Professional Limited Liability Company
643 Magazine Street
New Orleans, Louisiana  70130
Telephone:  (504) 586-1200
Attorneys for Defendant,
Wal-Mart Stores, Inc.

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on this _____19th_____ day
of_____March_____, 2001,served a copy of
the foregoing pleading on counsel for all parties to this
proceeding, by mailing the same by United States mail, Hand Delivery
properly addressed, and first class postage prepaid.

_____

-2-

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED